UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

CASE NO. 00-CR-6300-FERGUSON

UNITED STATES OF AMERICA,

        Plaintiff,

v.

BLONITA ROSERIE-ISABELL,

        Defendant.

_____/



## OBJECTIONS TO PRESENTENCE INVESTIGATION REPORT

The Defendant, Blonita Roserie-Isabell, by and through undersigned counsel, respectfully files the following objections to the presentence investigation report ("PSI") prepared by the probation office. Specifically, Ms. Roserie-Isabell objects to 1) the failure to provide a downward adjustment based on her mitigating role in the offense, and 2) the failure to provide a downward adjustment and a sentence below the minimum mandatory based on her compliance with all of the "safety valve" requirements.

**Mitigating Role.** Paragraph 17 of the PSI currently provides no adjustment for Ms. Roserie-Isabell's role in the offense. Respectfully, Ms. Roserie-Isabell contends that the facts of her case merit a downward adjustment based on her mitigating role in the offense.

Section 3B1.2 of the Sentencing Guidelines provides:

(a)    If the defendant was a minimal participant in any criminal activity, decrease by 4 levels.

(b)    If the defendant was a minor participant in any



criminal activity, decrease by **2** levels.

In cases falling between (a) and (b), decrease by **3** levels.

U.S.S.G. § 3B1.2. According to the Sentencing Guidelines commentary, the "minimal participant" provision:

> is intended to cover defendants who are plainly among the least culpable of those in the conduct of a group. Under this provision, the defendant's lack of knowledge or understanding of the scope and structure of the enterprise and of the activities of others is indicative of a role as minimal participant. . . . It would be appropriate, for example, . . . [i]n a case where an individual was recruited as a courier for a single smuggling transaction involving a small amount of drugs.

U.S.S.G. §3B1.2, comment (n.1 & 2). Further, the Guidelines provide that "a minor participant means any participant who is less culpable than most other participants, but whose role could not be described as minimal." U.S.S.G. §3B1.2. The Sentencing Guidelines, including the commentary, are binding on this Court. *See United States v. Stinson*, 113 S. Ct. 1913, 1917 (1993).

In the present case, Ms. Roserie-Isabell was a mere drug courier recruited for a single drug smuggling transaction. Ms. Roserie-Isabell imported just over 500 grams of cocaine into the United States from Jamaica. The cocaine was secreted in fifty pellets that she had swallowed and one container that she had stored vaginally. When she was arrested, Ms. Roserie-Isabell gave a full statement to Customs agents detailing her involvement in the smuggling operation. In her statement, which is consistent with the acceptance of responsibility statement contained in the PSI, Ms. Roseire-Isabell outlined how she was recruited by a man named Frank to go to Jamaica for the sole purpose of smuggling drugs back into the U.S. Frank made all of the travel and lodging arrangements, gave Ms. Roserie-Isabell spending money, and instructed her on exactly what to do. Another man in Jamaica, Mike, brought the drug-filled pellets to Ms. Roserie-Isabell for her to swallow. He stayed

to make sure that she swallowed all of the 51 pellets. He then drove her to the airport to meet Frank back in Ft. Lauderdale. Sadly, Ms. Roserie-Isabell never even received payment for her efforts, and she did not even know how much she was to be paid.

From these facts it is evident that Ms. Roserie-Isabell was recruited for a single drug smuggling effort involving 500 grams of cocaine. She did not know, and was never informed, where the drugs were coming from or how they would be distributed once here in the States. She only knew the bare minimum that she would need to know in order to act as a courier. She did not even make, or pay for, any of her travel arrangements. Under these facts, Ms Roserie-Isabell merits a **four-level** downward adjustment in her offense level based on her role as a **minimal** participant. *See* U.S.S.G. § 3B1.2., comment. n.2 (four-level minimal role adjustment proper "where an individual was recruited as a courier for a single smuggling transaction involving a small amount of drugs). At a minimum, she merits a **two** or **three-level** downward adjustment as a minor participant since she was clearly among the least culpable of those involved in the smuggling and distribution operation. Accordingly, Ms. Roserie-Isabell respectfully requests that this Court grant her a downward adjustment based on her mitigating role in the offense.

**Safety Valve**. The PSI accurately notes that, generally, importation of 500 grams of cocaine carries a five-year (60 month) minimum mandatory sentence. However, Ms. Roserie-Isabell respectfully contends that she has met all of the "safety valve" criteria, and therefore, she should receive a two-level downward adjustment on her offense level and a sentence within the guidelines and below the minimum mandatory sentence of five years.

Section 2D1.1 of the sentencing guidelines provides that in a drug offense where the initial offense level is **26** or higher, a sentencing court must adjust the offense level downward two levels

3

if the defendant meets the five criteria of § 5C1.2 ("safety valve"). U.S.S.G. § 2D1.1(b)(6). In addition, where a defendant meets the criteria of § 5C1.2, the sentencing court "shall impose a sentence in accordance with the applicable guidelines without regard to any statutory minimum sentence." U.S.S.G. § 5C1.2.

Ms. Roserie-Isabell has met all five of the criteria of § 5C1.2. First, as the PSI notes, she does not have more than one criminal history point. Second, in the offense she did not use or threaten to use violence and she did not possess a firearm or other dangerous weapon. Third, the offense did not result in death or serious bodily injury to a third person. Fourth, she was clearly not an organizer, leader, manager or supervisor of any others in the offense. Finally, after her arrest, Ms. Roserie-Isabell provided to the government a detailed statement noting all of the information she had regarding the offense. That statement, as transcribed by Customs agents, is attached as an appendix to this filing. In addition to that statement, Ms. Roserie-Isabell provided an acceptance of responsibility statement to the probation office. That statement, noted in the PSI, contains essentially the same information as the statement she gave after her arrest.

Ms. Roserie-Isabell has met all of the criteria of § 5C1.2. The base offense level for her offense is 26. Accordingly, this Court must reduce her offense level by two levels. *See* U.S.S.G. § 2D1.1(b)(6). In addition, this Court must sentence her to a sentence within the range proscribed by the applicable Guidelines calculations without any adherence to the five-year mandatory minimum sentence.

CONCLUSION

Ms. Roserie-Isabell respectfully requests that this Court grant her a two-level downward adjustment for meeting all of the safety-valve criteria. She further requests a four-level downward adjustment based on her minimal role in the offense. This would result in a total offense level of **17** which corresponds to a sentencing range of 24 to 30 months.

Respectfully submitted,

KATHLEEN M. WILLIAMS
FEDERAL PUBLIC DEFENDER

By: _____
Bernardo Lopez
Assistant
Federal Public Defender
Florida Bar No. 884995
Attorney for Ms. Roserie-Isabell
101 N.E. 3rd Avenue, Suite 202
Fort Lauderdale, Florida 33301
(954) 356-7436 / (Fax) 356-7556

CERTIFICATE OF SERVICE

I certify that a true and correct copy of the aforementioned motion was mailed on this 2nd day of February, 2001, to Bruce Brown, Assistant United States Attorney Office, at 299 East Broward Boulevard, Fort Lauderdale, Florida 33301.

_____
Bernardo Lopez

5

1. 9 LBS

9/27/00 WENT TO JAMAICA AIR JAM FT. LAUD. ~~DROVE~~ CAME TO FLL IN CAR. OWNER OF FRANK LNU. A STATES THAT FRANK LNU RECRUITED HER TO GO TO JM TO P/U DRUGS. ASSOCIATED OF A WAS PURCHASING DRUGS FROM FRANK LNU. F. LNU INQUIRED ABOUT A. ASSOCIATES NAME IS SERENA, LNU. ~~SERENA INTRODUCED A TO F. LNU~~ F. LNU WAS AT SERENA'S HOUSE AND F. LNU INQUIRE ABOUT A. SERENA TOLD F. LNU HIS NAME.

APPROX. 1 WEEK BEFORE TRIP SERENA CALLED A'S HOUSE AND SAID F. LNU WAS AT HER HOUSE AND SHE WANTED TO KNOW IF SHE COULD BRING F. LNU BY A'S HOUSE, THAT HE HAD A BUSINESS PROPOSITION. A ASKED WHAT IT CONCERNED AND WAS TOLD THAT THEY DID NOT WANT TO DISCUSS IT ON THE PHONE. SERENA LNU & F. LNU WENT TO A'S HOUSE.

F. LNU PROPOSITIONED A TO TAKE TRIP TO JM BY BOAT OR PLANE ALL EXPENSES PAID BY HIM. ~~HE WOULD LET~~ TO BRING BACK COCAINE & THAT HE WOULD LET A KNO QUANTITY ONCE ~~SHE~~ ARRIVED IN JM. F. LNU AL ASKED A IF SHE HAD ANY FRIENDS THAT WOULD LIKE TO GO. A TOLD F. LNU THA SHE MAY HAVE FRIEND NAMED YEVONN GRAFT. F. LNU TOLD A TO ASK YEVONNE. A CALLED AND ASKED YEVONNE IF SHE WANTED GO TO JM, THAT SOMEBODY WANTED THEM TO DO SOMETHING AND YEVONNE SAID "YEAH"

A TOLD YEVONNE THAT SHE DID NOT WANT
TO TELL HER WHAT IT WAS OVER THE PHONE.
~~SHE~~ YEVONNE SAID I DON'T CARE ITS BEEN
A LIFE LONG DREAM SHE HAD TO GO TO FM.
~~YEVONNE~~ A + YEVONNE ~~RODE~~ RODE DOWN
TO FLL WITH F.LNU IN A WHITE
SUV POSSIBLY A NAVIGATOR. ~~OF~~
DEPARTED FROM CLEVELAND ON MONDAY
9/25/00 AT 12:30 PM. ARRIVED FLL
TUESDAY 9/26/00 7:30 AM. A + YEVONNE
WERE TAKEN TO A HOTEL (COMMERCIAL)
VEHICLE ~~OF~~ DESCRIPTION WAS GIVEN BUT
NO TAG. REGISTERED UNDER REAL NAMES.
F. LNU DROPPED A + OTHER FEMALE AT
HOTEL AND LEFT, STATED HE WAS GOING
TO A FRIENDS HOUSE. F. LNU RETURNED
AT 11:00 PM THAT EVENING TO SEE IF
THEY WERE OK AND TO LEAVE MONEY FOR
FOOD. F. LNU CAME ~~IN~~ IN W/ANOTHER
MALE FNU/LNU. F. LNU + FNU/LNU LEFT.
F. LNU ALSO OBTAINED THE NAMES OF
A + YEVONNE SO HE COULD GET THE
TICKETS. YEVONNE ASKED WHAT TIME
THEY WOULD BE LEAVING ON WEDNESDAY
SO THEY WOULD BE SURE TO BE AT
THE HOTEL. F. LNU SAID ABOUT 12, 1 PE:
YEVONNE SAID WELL CHECK OUT IS AT
TWELVE. ~~BE~~ F. LNU SAID HE WOULD
BE THERE BECAUSE HE WANTED TO TAKE
THEM SHOPPING FOR NEW CLOTHES SO

THEY WOULD HAVE SOMETHING NEW FOR THE WAY BACK AND WANTED TO HAVE HIS HAIR BRAIDED.

F. LNU SHOWED BACK AT HOTEL ON THE NEXT DAY W/ FNU LNU AT APPROX 10:00 A TO HAVE HIS HAIR BRAIDED. F. LNU + 2ND INDV. WERE WAITING IN PARKING LOT FOR A + YVONNE. FRANK WENT INTO HOTEL WITH A + Y. FNU LNU WAITED IN VEHICLE. A ASKED FRANK IF HE HAD A COMB. FRANK SAID NO. Y TOLD FRANK THEY SOLD THEM IN A MACHINE IN THE LOBBY. FRANK DEPARTED AND DID NOT RETURN UNTIL 12:10 OR 12:15 P.M. THIS TIME FNU/LNU CAME IN AND WAITED WHILE A BRAIDED FRANKS HAIR.

THEY ALL DEPARTED HOTEL AND WENT TO A SHOPPING PLAZA AND P/U UNKNOWN FEMALE (PROB. FNU LNU'S WOMAN.) FNU/LNU AND FEMALE WERE DROPPED OFF AT SOME APT COMPLEX. FRANK THEN RETURNED TO SHOPPING PLAZA W/ A + YVONNE. ALL ABOUT OUTFITS, THEN PROCEEDED TO FLL AIRPORT. FRANK GAVE THEM TIFFTA TICKETS AND DROPPED THEM OFF AT THE DEPARTURE AREA AND TOLD THEM TO CHECK IN AT AM J. HE STATED HE WAS GOING TO GO PARK CAR. YVONNE COULD NOT TRAVEL BECAUSE THEY WOULD NOT ACCEPT PHOTO COPY OF LICENSE. YVONNE SPOKE TO FRANK WHEN HE RETURNED AND TOLD

She wanted to go to JM and she would attempt to get a photo I.D. She said if she couldn't get back in time for the flt. she would try to get on another flt. on another day. Frank gave Yvonne $120.⁰⁰ and gave her a phone number and the name of hotel "Gloriana" in Montego Bay and told her if she made to JM that was how to make contact w/him. She never made it. —

Upon arrival in JM △ and Frank were p/u at airport by Franks brother. Frank intro'd driver as "my brother he does jewelry. The vehicle was a red p/u truck extended cab. Never gave △ name. △ was dropped at hotel. Frank went into hotel and registered △ and paid for room. Frank did not go to room. Later that day Frank returned and took △ out to dinner. Frank was w/ a totally different male. Bought △ a sub sandwich and then departed stating that △ would hear from him. Also gave △ $100.⁰⁰ U.S.

Frank called room late the next day (Thursday 9/28/00) asked how she was doing

Frank came by hotel on Friday late evening. Hotel called A room and said "Frankie" is here to see you. Frank had to sign sheet to go to A's room. Room #2130. Frank did not go into room just asked if A was OK. Frank left and did not return till Friday 9/29/00.

On Friday Frank returned to Hotel w/ a male named Mike. A went into car and was intod. to Mike. Frank said he was sorry he left her at hotel and took her w/ them to do errands. Frank was looking for someone. Went to Police Station and came back out. Went to 3rd house. Then was taken back to hotel. Frank + Mike departed. Returned the next day (Saturday 9/30/00) told A to get A/L ticket. Frank told A that he was not finished and that she was going to have change her ticket to the 1st (10.01.00). They allowed A to ride w/ them and went to "Alot" of houses then went to the ghetto part of Montego Bay. They kept going to an auto body shop. They stopped at the "Immigration's" office for the Cruise Lin

FRANK AS IMMIGRATION PERSON. FRANK + ~~TOLD A THAT~~ IMMIGRATION GUY WENT UP TO AN OFFICE. WHEN THEY CAME BACK TO THE CAR FRANK "SLIPPED" AND ENVELOPE TO THE IMMIGRATION MALE. FRANK ENTERED THE VEHICLE. FRANK STATED "SEE I HAVE PEOPLE IN ALL PLACES I HAVE TWO ~~POPPED~~ HERE AND SOMEBODY IN FLORIDA." IMMIGRATION @ ABOUT 6'4" DARK COMPLEXION APPROX. 20 LBS.

THEY DEPARTED DROPPED MIKE AT BODY SHOP. FRAND DROPPED A BACK AT HOTEL ~~AT~~ APPROX 3-4 PM. FRANK CALLED ROOM THAT ~~WAS~~ AND SAID HE WAS COMING TO GET A.

FRANK P/U A AND TOOK HER TO WHERE HE WAS STAYING AND ~~SHOWED~~ HER THE PELLETS. FRANK TOLD LITTLE BOY IN ROOM TO LEAVE. HE RETRIEVED A BROWN TOWEL FROM ON TOP OF A METAL CABINET INSIDE THE TOWEL WAS WHITE BAG, INSIDE THE WHITE BAG WAS A BLACK BAG WITH APPROX 160-180 PELLETS. A ONLY OBSERVED THE PELLETS ON THIS OCCASSION. A WAS TAKEN BACK TO HOTEL BY FRANK A EXPRESSED FEAR AT THAT TIME RELATIVE TO THE SIZE OF PELLETS. FRANK TOLD HER PEOPLE HAVE TAKEN BIGGER ONES THAN THAT

APPROX 1 HR. LATER FRANK RETURNED

To HOTEL W/MIKE AND TOLD A HE WAS TAKING HER TO A/P TO CHANGE TICKET FOR NEXT DAY WHICH WOULD BE (SUNDAY 10/01/00)   ENROUTE TO A/P FRANK STARTED TO EXPLAIN THE FOLLOWING POINTS:
(S/A Richard Jolkes takes over writing) *

- You will no longer see me.
- "Mike" is me.
- Mike will bring the pellets to Δ for her to start taking.
- Find a rhythm & keep the rhythm while swallowing. Drink something comfortable.
- Don't be scared - most take twice as much.
- Mike will be there whole time.

They arrive @ A/P - Δ changes ticket to Monday am flight. $50 charge fee. Frank takes her to hotel - gave her food $ & said good-bye.

Mike calls next day @ 12 PM - Picks her up & takes her to a house Δ picked up bag w/ drugs.

Went & p/u food & drink & returned to hotel. Paid for extra day @ hotel - hid drugs in food shopping bag. They go back to room & Mike says he'll be back @ 5pm to help her take the pellets. He returns @ 5pm & she starts swallowing.

Swallowed 51 & said could go no more. He (Mike) leaves & says he'll be back to see if she can swallow more.

Meanwhile, D's money stolen by another guest so Mike decides she shall switch hotels. So they change hotels - name unknown.

He leaves her there & says will be back w/ the vaginal insert. He comes back midnight w/ insert & eventually got it in. Next am went to A/P w/ Mike. He gives her $50 for charge fee for ticket + some other money. She boards plane. Did not know how much $ she was going to be paid for delivery. Did not know who was going to pick her up - she assumed it would be Frank.